Good morning, Your Honors. My name is Jan Behar, and I represent Mr. Maximo Ricardez in these proceedings. Your Honors, the main issue is whether Mr. Ricardez's forced voluntary departure in 1998 at the age of 18 was an egregious violation of his constitutional rights, warranting suppression of the events set in motion by the government's misdeeds, which the government now argues, bar him from relief, and actually should he be placed back in the position he was in prior to this unlawful removal. The context of the facts is important. Mr. Ricardez was 11 years old at the time when he entered the United States. He did not come here with the intent to violate the law. He was a child. He was brought by his parents. We're not talking about a callous criminal alien who insists on talking about someone who was brought here as a child and who the government in its own writings has acknowledged has no criminal record whatsoever. The only question is... I think we know all the facts in terms of, and then when it all started again, he was 18. So he's young, and then he has several times right after when he's 18 that he tries to get back in because he's trying to get to his dad or whatever as far as that goes. And the most important point there is why was he trying to get back to his dad? He was trying to get back to his family because the government put him outside unlawfully. He's on a bus, not traveling north to Los Angeles. He's traveling within the city of San Diego area in the county. He's going to visit his girlfriend who is now his wife. Border Patrol agents board the bus. The bus is half full. There's a sea of white faces. He's the only Hispanic in the bus. Who do they pick on? They pick on him. They question him. They ask him about his So what do they do? They take him off the bus, take him to their station, hold him for hours in a dirty cell, and coerce him into agreeing to voluntary departure because otherwise... Let's get to that because I'm not particularly moved by your Fourth Amendment claims. I think that your Fifth Amendment claims are better. Let's just say for purposes of argument, if we decide that Ricardo Rivera established a Fifth Amendment claim before the IJ and the BIA thus erred in denying the appeal based on insufficient evidence or misconduct by the DHS officials, are we even able to reach the merits of his argument that removal orders should be suppressed or are we prohibited under Ventura because the BIA has not first addressed this issue? Well, Your Honor, you're correct. Neither the BIA, actually neither did the judge address any of the issues, which is one of the reasons why we're claiming that his due process was violated. It was violated twice by the Border Patrol and... But let's say if we agree with you. ...then I think that the correct result in this case is pursuant to your decision, Salgado-Diaz v. Ashcroft, where the court said that the correct remedy is to place the Petitioner in his original pre-arrest status. And that's really what we're asking for. We're not asking for, initially, for relief under Perez-Gonzalez or Bona or any of those other decisions. Obviously, we did cite them. They are an important area of relief, but our primary source of relief is specifically Salgado-Diaz v. Ashcroft. We want Mr. Ricardez put back in the position he was in before the government violated his rights and put him in a position where he is now possibly barred from any relief. And I couldn't help but listening to the comments in the prior case. And similar to the situation in the prior case that you just heard, Mr. Ricardez did make a claim to citizenship in trying to reenter the United States. He only made that claim to citizenship because the government put him in that position by throwing him outside the country without any opportunity to prepare for that. Well, I know that you're relying on Salgado-Diaz, but there's a difference in the posture of the case. And that's why I'm not sure that I agree with that it wouldn't have to be remanded to let the BIA deal with it. In Salgado-Diaz, the proceedings were based on an illegal entry. So he was not seeking to suppress removal orders. I mean, you're essentially looking to come up with, you know, go where no court has exactly ever gone yet and apply the exclusionary rule on these due process violations. Well, the main difference I mean, this is, that's pretty huge. The main difference that I see between my case and Salgado-Diaz is that in Salgado-Diaz, the person was actually in removal proceedings. He was in deportation proceedings. And the government arrested him and didn't believe he was in proceedings and took him outside. So when he tried to come back in, that position was a little bit different. Ricardez was not in proceedings. And the government has argued, well, Salgado-Diaz had a remedy available. He had – there was prejudice in his case because he was already in proceedings, so he was trying to defend himself. Well, Ricardez wasn't placed in proceedings and had nothing to defend at that point. The issue is precisely why didn't you put him in proceedings and let him defend the charges, if any charges that you might have been able to bring against him instead of simply running away? I guess I read the case as it could possibly support the argument that a removal order itself could be subject to the exclusionary rule, but I don't read it as specifically so holding. I'm not understanding your question. Well, I don't think that – I don't think that – I think Salgado-Diaz suggests that possibly the exclusionary rule could apply here, but I don't think it specifically holds that. And so in that instance, I think – I don't think Salgado-Diaz just necessarily gives – it isn't exactly on point. You're asking for an extension of what that case holds. And that being the case, why shouldn't the BIA be able to decide that in the first instance? Well, the BIA could decide that in the first instance. They passed on it when they simply did not do anything about it, just like the judge passed on it by simply saying – without taking any testimony from anyone, by the way – simply saying that he was not in a position to take any testimony, that there was no fruit-of-the-poisonous-tree doctrine in this case, that he just wasn't going to take any testimony. Well, they just – they said you didn't establish a prima facie case, right? Correct. That's what they said. But if we said you established a prima facie case, then why shouldn't they be the ones in the first instance to decide whether the exclusionary rule applies in this sort of situation? Well, that was actually what we were trying to accomplish when we went before the immigration judge. We felt that we had established a prima facie case by submitting a five-page affidavit from Mr. Dicardes and asking that he be allowed to testify in support of that. Our position all along has been, return him to the position he was in before the egregious violations that set in motion the events that now potentially render him permanently barred. Because all the things that he did to come back into the United States, the illegal presence, the 212A9C problem with having been – having reentered after expedited removal, all those things are waivable under Perez-Gonzalez or under a form I-212. What is not waivable is the false claim to U.S. citizenship charge. There is no waiver of that. There's a waiver of fraud. There's a waiver of misrepresentation. But the misrepresentation section has two parts to it. And the second one is the more specific, which says false claim to U.S. citizenship, and that one is not waivable. Well, let me ask you this. If he – oh, I'm sorry. Judge Fletcher, go ahead. Go ahead. On a factual matter, had his father initiated adjustment of status proceedings? Your Honor, he had. He had not initiated adjustment of status because that wasn't possible, but he took the initial step to reach that. He filed a petition on his son's behalf in 1995. That's evident in the record. Because my client's father is a permanent resident, that petition is a very lengthy wait. So he could not actually take the step to adjust status until that petition became current. And he did adjust status – I'm sorry. He did try to adjust status later after he returned through his U.S. citizen wife, taking advantage of the 245i eligibility that his father had established for him in 1995, which by the way, government counsel says doesn't count, but I would point to 8 CFR 245.10 for that, for the grandfathering provision. And in addition, I would point out that he filed through his wife on March 21, 2001, which is before the April 30, 2001, deadline. The other thing is that government counsel has argued that he has not provided proof that there is an approved petition. Well, there is a petition. Page 386 of the record has the actual filing date of March 21, 2001. That petition remains pending in the hands of the government. It has taken five years. They have yet to adjudicate that petition. It is not his fault. Oh, let me ask again. What goes into the petition that his father filed for him prior to all of these events happening? The petition that his father filed for him is called an I-130 immigrant visa petition. It essentially establishes that the petitioner, his father, is a permanent resident or a citizen of the United States, in this case a permanent resident, that he has a biological relationship, a family relationship with the beneficiary, and that the petitioner wishes to qualify this person as an immigrant. As soon as that is filed, he preserves what is a permanent resident. Thank you. Ricardo Rivera has failed to allege prejudice in his motion to suppress before the I.J. Is that fatal to his argument that he established a due process violation before the I.J.? No, Your Honor. I don't – I strongly believe it does not. First of all, he did have – he did establish – we did argue prejudice. And the prejudice that we argued was, A, that he could have – he challenged the whole removal from the United States. So he could have very well brought a motion to suppress the arrest and fought the case on that basis. Number one, he could have asked for administrative closure so that prosecutorial discretion could have been applied. Prosecutorial discretion is a procedure by which the they can be resolved, precisely because a visa petition is available and because if the case goes forward, there will be some very drastic harm to this person, such as the application of Section 212a and 9b, which bars the person for 10 years. The other prejudice that he clearly has and which we did not raise at the – at the initial hearing, in the initial brief, but which clearly is evident, is voluntary departure itself. There's a huge difference between grabbing an 18-year-old and throwing him out of the country with the clothes on his back and whatever pocket change he has when he was going to visit his girlfriend than to go before an immigration judge, get a period of voluntary departure of 120 days, during which his family could have made arrangements for him to remain in Mexico with relatives. They could have given him some money, some kind of structure so that he doesn't just get thrown out into the street and say, geez, now what do I do, and finds that the only way to come back is to go to the border and try to sneak in. Well, let me ask you this. If, assuming that the three removal orders in question are not factored into the adjustment of status equation, would your client otherwise be eligible to adjust his status? Are you saying if he were put back into the position that he was in before? Well, if the three removal orders were not factored in. If the three removal orders were not factored in, the only problem that he would have is the false claim to citizenship, Your Honor. Okay. Well, that being the case, because what you're asking to do is to suppress those, if the answer is no to that question, even if we do that, why shouldn't the petition then be denied? We're asking that he be placed, well, we're asking for those to be suppressed, but as well as all the conduct that was set in motion by the government's misconduct, including the false claim to citizenship, Your Honor. In other words, the expedited removals based on his false claim to citizenship include the false claim to citizenship. That is really what we need suppressed here. If he is placed back in the position he was to be in. So you need more than the three removals suppressed? Yes, because we do need the false claim. The other things don't matter.  There is no issue of bad moral character, except that perhaps reentry after deportation can be found to be a lack of good moral character. He has a basis to get that waived. There is a waiver for that. 245I waives the unlawful presence. And Perez-Gonzalez waives the 212A9C problem as well. The real issue is how do you get around that false claim to U.S. citizenship? And there is no waiver for that. So that is really why we believe that the correct remedy is to put the Petitioner back in the position he was in before the government's incorrect conduct. Your Honor, I'd like to reserve some time for rebuttal. All right.  Thank you. Good morning. Good morning, Your Honor. So my name is Carol Federighi. I represent the Respondent, Alberto Gonzalez, in this matter. Your Honor, the Court does not need to reach the issues of whether his departure in 1998 violated the Fourth Amendment or the Due Process Clause. After he accepted that- What gives government officials, whether it's a local policeman or FBI or CIA or Border Patrol agents, the right to enter a public bus that's in the United States and traveling only in the United States and demand identification from the passengers? What gives them that right? Without any suspicion at all, except racial profiling. They are not allowed to question someone solely on the basis of racial profiling. They would have to have other indicia that made them suspicious somehow of the particular individual they wanted to question. Was there a suspicious about this 18-year-old boy who had been in this country for 11 years riding a public bus in San Diego? And the only one who was questioned. And my question to you is, what gives the police officers or the Border Patrol the right to question anybody, including animals? In general, you're correct. Border Patrol or other police officers don't have the right to just question anyone at random. They do have to have some sort of suspicion, reasonably based suspicion, that the person is in the country illegally. Of course, if there's suspicion that he's going to commit a crime or committed a crime or wanted. But here, there was absolutely nothing, except he was an 18-year-old Hispanic riding a public bus in San Diego. And all of a sudden, he ends up being a criminal. Well, we need to look at the posture of this claim that he was bringing, his Fourth Amendment claim. He did not raise it before the IJ, so there was no hearing on that issue for that reason. He did raise it for the first time before the board. At that stage, the board looked at it with the idea that if he'd raised a sufficient prima facie claim of a violation, then perhaps it would be remanded to the IJ. But he had to at least make a prima facie case that there was a violation. They looked at his declaration and saw that his declaration does not make out a prima facie case of a Fourth Amendment violation. All he says is that he was riding the bus, the officers came on the bus and questioned him. He was the only one questioned. He does not say that he felt that he was singled out on the basis of his Hispanic appearance. He also does not say that he was the only Hispanic-appearing person on the bus. My question is deeper than that. It had nothing to do with what he said or what he didn't say. What gives them the right to question somebody who was 18 years old or 50 years old, who's either Anglo or Hispanic or black or whatever nationality, without any suspicion whatsoever? They must have had to. Is that a thing, the way things are done in America today? No. And there's no evidence in the record that they had no suspicion of him. The facts were not developed. There's nothing in the record saying he had suspicion either. No. But Mr. Ricardez had the burden to show at least a prima facie case of a Fourth Amendment violation, and he failed to do so. Counsel? Yes. When he says that he's the only one questioned, doesn't that make up the prima facie case? I don't think so, Your Honor. He does not say that he felt he was singled out improperly based on a racial basis. There could have been other indicia. He looks as if he ran away from them or, you know, I don't know. As I said, the facts were not developed, and he did not present enough evidence to show that there was an improper basis for him being singled out. He only said he was singled out, but he didn't say that he felt that there was no proper reason for him to be singled out. So I don't believe that makes out a prima facie case. Let me take you back to where you were starting in terms of why you said why the court doesn't have to get to certain issues. Right. Please tell me your position on that. Regardless of the validity of his original voluntary departure in 1998, he subsequently voluntarily on his own, by his own impetus, reentered or attempted to reenter the United States illegally on at least four occasions. As a result of his own personal decisions to reenter the U.S., he was ordered removed three times. Then when he attempted to enter the fourth time, that's when he was placed in the proceedings that led to this case here. In those proceedings, he was granted the full plenipotentiary rights that are due and alien in that situation. However, because of his previous removals and reentries, Mr. Ricard is unfortunately ineligible for the relief that he has sought, which is adjustment of status or cancellation of removal. He does, as I said, he seeks to avoid the consequences of his subsequent reentries and removals by claiming that they all were stemmed from this initial first encounter. But for the first encounter, he would have been able to reside here undetected and not incurred these bars to relief that he's since incurred. But the fact is that his subsequent removal orders were the product of his own independent actions, which broke the chain of linking those actions to the original removal or voluntary departure as a fruit. So there's no way that all of his subsequent encounters with the immigration authorities were the fruit of his original encounter because he voluntarily chose to continue to break the law. Well, let me ask you this, though. Let's say, hypothetically, let's say I agree with you that he hasn't shown a prima facie case for the Fourth Amendment, but I don't agree with you on the Fifth in terms of that, because he, you know, giving him all inferences in favor of what he established in terms of his age, the conditions of the cells, the time period, that he wasn't given an opportunity to voluntarily depart or there were administrative disclosure and other issues. Let's say if I agree that he should have had a hearing on that. From your perspective, what would the remedy be on that? Well, the remedy would be to go back and give him that hearing to determine if he was properly removable at the time. But the fact is he had no relief available to him at the time, so he would have been removed by a formal order of the immigration judge if he had gone to proceedings. I guess from the standpoint, because, see, they're arguing, okay, then it goes to the prejudice prong in terms of, and essentially you're saying that, okay, even if he can establish a due process violation, then he voluntarily came back these other times, he's got all of those problems, and so he's not going to be able to prevail. But what appellant's counsel, as I argue it, as I understand his argument, is saying that based on Salgado Diaz or Diaz-Salgado, that the other things need to be suppressed. And what I was questioning him about was I was saying, well, I don't think that case exactly stands for that. I don't find anywhere that says that there is an exclusionary rule, if I were to agree with you, that that should be something that the BIA needs to decide in the first instance or whether they're going to have a BIA rule when they are, if they were to find a due process violation. What's your position on that? I mean, he obviously wants to wrap it up, he wants to wrap it up all here and be back, you know, get rid of everything. But you're saying there's no prima facie case on anything, he can't win anyway because he came back, all of that. But if we don't agree with either of you, I'm. Where does it go? Which I don't think I'm completely agreeing with either of you. I can't speak for the panel, but. I'm not sure I understand your question. The issue of whether the subsequent removal orders are a fruit of the original removal or voluntary departure. Well, is there any, I don't find any case out there that exactly stands for the freedom of the poisonous tree on conduct in immigration cases. Is there something out there? He's saying it's Salgado-Diaz. I don't think it stands exactly for that proposition. There are, I know I've briefed this issue, so I know that the principle, I would argue the principle for fruit of the poisonous tree does apply in general to immigration proceedings. So if someone was unlawfully arrested by immigration officials and subsequent, you know, there was fruit of that arrest, that would be suppressed. That should be suppressed if it was an egregious Fourth Amendment violation. But in this case, the fruit doctrine, there's some exceptions to it, and one of them is independent, an independent action. In this case, it's his own independent actions that caused these subsequent events. Well, but what he's essentially saying, he's not characterizing them as independent as you are in the sense that he's saying he's an 18-year-old, he's stuck there with, you know, that it's a little bit, so those facts have not been really ferreted out. That's your position? If that's, we're back in he says, she says here. Yeah, I'm not sure I would agree that it's a factual issue. I think it's a legal issue. We all agree on the facts in terms, not in terms of the voluntary departure, but everything after that, we agree on what happened. And he, regardless of his age, he was 18. He wasn't a minor. He was, and then he repeatedly violated immigration laws by repeatedly reentering or trying to reenter the country, even after being ordered formally removed in these subsequent expedited removal orders. It's, in that case, it can be distinguished from Salgado Diaz because in that case, he was ordered removed while he was in proceedings, and that's one way to distinguish it, because then his removal terminated his proceedings, and that prejudiced him. But he reentered only one time, and he did not receive removal orders, and that's, as Your Honor pointed out, it would be a stretch to apply the sort of suppression of fruits doctrine to actual removal orders. There were no removal orders against Salgado Diaz in his case. But in this case, there are two removal orders and a reinstatement order that Mr. Ricard has incurred, and yet he continued to come in and violate the immigration  laws. He would have been able to, after his first voluntary departure, what he should have done, he could have stayed in Mexico and contested his departure. From there, he could have sought parole to come into the U.S. to contest his treatment, his arrest, and so forth. He could have waited in Mexico for his father's visa petition to go through the process or sought admission, you know, for any other reason. So there were legal means for him to get back into the country or to contest his treatment at the time. Instead of pursuing any of those legal remedies, he took it upon himself to illegally reenter the U.S. on repeated occasions. But he wasn't, he didn't have any counseling available to him. He's an unsophisticated 18-year-old thrown out of the country just precipitously, not expecting anything like that. What do we expect of a person like that? Do we expect them to seek sophisticated legal aid? Yes. As anyone entering the United States needs to know the laws and needs to be familiar with them and seek counsel. Well, I think, you know, he is 18. That's true. But I think you probably have some people here that have had 18-year-olds that aren't living on their own and aren't self-supporting. And so I don't know that we say that an 18-year-old is the same as a 30-year-old. I mean, legally, you know, but I think that's what Judge Fletcher is getting at to some extent. I mean, you can argue that all of those things are really available, but it is a little bit different when someone is 18. And he'd been living with his parents, right? Did he have a place to live in Mexico? He says no because he had left there when he was 11. So, admittedly, he probably was, you know, buffaloed as to what to do when he got to Mexico. Well, I mean, your solution sounds good in theory, but it doesn't sound to have total practical. Well, he was not. I mean, he could have called his father, who already knew enough about the immigration laws to apply for a visa for him through the I-130 process. So he could have. There are telephones in Mexico. He could have called his parents and sought their counsel, which is what 18-year-olds would typically do is rely on their parents. And their parents, also his father, who originally, I think, his father originally came here illegally decades ago, but eventually became a lawful permanent resident. So he obviously knew a significant amount about the immigration process or had counsel who helped him through the process. So he did have that remedy of calling his parents and asking them what to do without taking the law into his own hands and illegally reentering the country. He had two expedited removal orders entered against him in 1998. Both of those orders specifically tell him you can't come back to the country. The first one said within five years. The other one said within 20 years. I mean, he had written documents also. And then he again tried to reenter the country in 2001. By that time, he was 21, and he'd already had multiple encounters, which would have educated him, I would assume, with immigration authorities. So I don't think that we can say he continued to maintain this sort of innocence that he's claiming that caused him to at least initially try to reenter the United States. Rather than getting educated, I suspect he became more desperate and more desperate. Didn't know what to do except to try to get back. I mean, it's a very sad case. It is. The facts are it does seem harsh because he is married to a U.S. citizen. But again, he did repeatedly violate the immigration laws, and Congress has determined that people who repeatedly violate immigration laws are subject to more onerous bars and restrictions than people who don't. And that was a decision that Congress made based on its view that these laws should be upheld. I agree with counsel that – I mean, with the panel or at least with Judge Callahan that if the Court determines that it does need to reach the Fourth Amendment and the Fifth Amendment issues and that it finds that Petitioner has made out a prima facie case of violations of those, then it should be remanded under Ventura back to the agency for them to hold hearings on those issues because the hearings were never held on those issues because the I.J. determined that he didn't need to reach them because there was – that the fruits doctrine didn't apply here where he independently reentered the country and incurred all these removal orders. Counsel, I wanted to commend you on sending your 28-J letter and letting us know exactly what issues could be continued. And I think the government was very right in that regard, and I thank you for it. Yes, I apologize for not sending it even earlier, but at least I got here a few days before. And I'm glad you had a chance to look at it, so. And I just want to then close by summing up the reasons why he is barred from relief. First, he's barred from adjustment of status because under 212.9a – or let's call it 1182. That's the statutory section, 1182a9c. He's barred because he reentered after being ordered removed, and he also reentered after having accrued one year of unlawful presence. Perez-Gonzalez does not apply here because he has not sought a waiver of his inadmissibility as the alien in Perez-Gonzalez did. As for his I-130, his wife filed a visa petition for him in 2001. That he ended up withdrawing when his removal order was reinstated, and he was removed in 2001. Then she filed a new I-130, a new visa petition during proceedings. There's no evidence in the record that that I-130 was actually ever filed with – it was then the INS. It's now – well, it might have been anyway – with Department of Homeland Security. And I don't know the status of that. It's hard for me to find out without getting the receipt notice, which is not in the record. So there's no evidence that was ever filed, and we don't know what its status is. And without approval of the visa petition, he wouldn't be eligible for adjustment either. As far as cancellation of removal, he's ineligible for that for two reasons. One, because of the lack of good moral character due to the fact that he was removed and then sought admission within five years of being removed. And that – Are these comments all going to the prejudice? I mean, how do we factor what you're saying in here? If, for example, if – is that to say why he wasn't prejudiced? Because – Well, no. These go to if the court finds that it doesn't – it's not going to suppress the removal orders, then these are why he's barred from this form of relief. Okay. But – so it may be the court doesn't want me to focus on this at all. No, that's fine. If the main issue that the court is going to focus on is just whether – Is racial profiling good moral character? Well, he didn't – You're claiming he didn't have good moral character. Right, by the statutory bar. My question is, it turns out the officer who engaged apparently from the record in racial profiling, and my question is, is that good moral character? Well, the moral character of the officer is not at issue here. Oh, it always is if he didn't have a right to question somebody, if he's violating somebody's constitutional rights as an American. Well, he's not an American, actually, but he does have constitutional rights when he's in the country as an agent of certain rights. Does he have a right to engage in – my question is, does he have a right to engage in racial profiling? No, the officers do not have a right to engage in racial profiling. Isn't that what happened in this case? There's no evidence of that. What suspicion did he have? If the court is concerned – He has to justify his questioning, doesn't he? Not until the alien has put forward a prima facie case that there was some violation, especially given the posture. What case is that? Because he did not raise this issue before the IJ, he only raised it to the board, so the board was looking at it in the context of should this be remanded, and on a motion to remand, the board looks at whether the alien's established a prima facie case to the relief side, and that's in the regulations, motions to reopen. So that's what – because of the posture, that was what the standard the board was applying. And the alien did not claim racial profiling in that prima facie showing? In his declaration, he did not claim he was singled out on the basis of racial profiling. He just said he was singled out, but he did not give a reason. If the court – as I said before, if the court is concerned about that issue, I would urge it to remand it to the agency for the agency to preferably have a hearing on the issue, because it was not developed before the IJ, because as I said, the IJ found it wasn't relevant because he felt the removal orders could not be suppressed based on the original voluntary departure. And so he did not have a hearing on that issue, and we do not have the facts in the record as to whether racial profiling, improper racial profiling actually occurred. Thank you. I think we have your arguments in mind. Thank you for your argument. Thank you, Your Honors. As to the racial profiling issue, he did not specifically say why he was singled out. He did say he was singled out. Now, it begs the question, why does a Border Patrol officer get on a bus and start looking around for people and singling people out? They're not looking for shoplifters. I don't think it takes a rocket scientist to figure that one out. They were not looking for shoplifters. They were looking for people that were unlawfully in the country. I think that's abundantly clear. The case that Your Honor was referring to, there's two of them. One is Bregnione Ponce. That happened at the checkpoint over by San Clemente, and the result of that case was the Supreme Court said that for an immigration officer to – first of all, it separates the checkpoints, which are the functional equivalent of the border, from roving patrols. And the case establishes that roving patrols are not permissible, as in fishing expeditions, but they are allowed to patrol the areas, patrol the United States, and if they make an arrest, they have to justify it with articulable reasons. In Nicacio, the Court said that some of the articulable reasons, the site of which were not proper articulable reasons. Among them were Hispanic appearance, the fact that the person spoke Spanish, the fact that they had an unkempt appearance, the fact that they wore dirty clothes or dirty shoes. Bostic is a bus case, though, too, right? Sorry? Bostic is a bus case? Yes. I mean, this was on a bus, right? This was on a city bus. All right. So does that case have any bearing here? I don't know, Your Honor. Okay. But essentially the issue is whether there was a prima facie showing at the BIA, right? And so we have the declaration to look at and go from there. Right. And I would also point out that Mr. Ricardez presented himself in court and was ready and willing to testify in support of that affidavit and expand it to whatever length it had to be. I don't think that the law requires that the affidavit be a 250-page treatise on exactly what happened. It only has to establish that it was a prima facie case, and I think that that has been clearly shown. Counsel keeps alluding to independent actions. That was actually dealt with in Salgado by this Court. This Court said where the government was actually trying to do the same thing, saying that Salgado had violated the law after he was improperly removed, and it was an independent reason to remove him, the Court found that the government was trying to bootstrap a client. And that it could not take advantage of its own wrongdoing to insulate the misconduct from being reviewed. The Court also found that if Salgado could establish that the government's actions prevented him from having his hearing, the government could not rely on post-expulsion events that its own misconduct set in motion. That's exactly what we're arguing here. All these events that Mr. Ricardez fell into, that he committed, were committed precisely because the government expelled him illegally. Had they not expelled him, this young man would never have been in Mexico, would never have attempted to cross the border saying he was a U.S. citizen. And by the way, the way it occurred is a little bit different. He was expelled. Within hours, he was back at the border trying to get back in, scared. He was caught right then. He was expelled again. Well, his position is he was, even though he was 18, he had nowhere to live, right? That's correct. Basically, he had no money, nowhere to live, the whole thing. He had the clothes on his backyard. He had, that's all he had. And his folks were in the United States. Yes. And counsel, you know, in a perfect world says, well, he could have sought counsel and he could have done this. I don't know of any legal aid society in the city of Tijuana, Your Honor. I don't know that how he could have gotten counsel or found a way to get back into the United States legally or protest the treatment that he received. If he's at the border patrol station in the middle of the United States and says directly to the officer. Your argument is basically he's desperate, you know, for housing, for food, for money, for the whole thing. Yes. So that's what. And in terms, Your Honor, talked about his level of sophistication. His father is a farm worker, as I recall. These are not the most sophisticated, most educated people in the world. Yes, they did seek counsel. They knew enough to go and file a petition on his behalf. And they waited all the years that it took for it to become current. It wasn't their fault that the young man was thrown out illegally. If there's no more questions, Your Honor, I thank you. All right. Thank you for your argument. This matter will now stand submitted.
judges: B. Fletcher, Ferguson, Callahan